HENRY CROMARTIE, ADMINISTRATOR OF HARDY CROMARTIE, v. R. R. STONE, TRADING AND DOING BUSINESS AS STONE TOWING LINE.

(Filed 7 December, 1927.)

**1. Evidence—Nonsuit.**

Upon defendant's motion as of nonsuit, the evidence which makes for the plaintiff's claim and tends to support his cause of action, whether offered by the plaintiff or elicited from the defendant's witnesses, will be taken and considered in its more favorable light for the plaintiff, and he is entitled to the benefit of every reasonable intendment upon the evidence, and every reasonable inference to be drawn therefrom.

**2. Negligence—Navigable Waters—Waters—Locks—Dams — Evidence— Nonsuit—Questions for Jury.**

Where there is evidence tending to show that the defendant had anchored for the night its boat towing two lighters, at a government lock or dam on a navigable river, in such a manner as to cause the second lighter, left without a light, to block up the provided entrance to the safe water of the river, and that in the night it caused the raft on which was riding the plaintiff's intestate, in not being able to pass into the safe water, to swing into the fast-flowing water of the middle stream which would carry the raft over the dam, which the defendant from long experience should have known, and that the intestate was in consequence forced to leave the raft, and was carried over the dam and was drowned: *Held,* there was sufficient evidence to take the case to the jury upon the issue of defendant's actionable negligence.

**3. Navigable Waters—Negligence—Rafting Waters—Common Law.**

The rights to the use of navigable water are not superior for boats towing lighters or barges thereon to those using it for rafting purposes, and where the negligence of the former in such use causes the death of an employee on the latter, the principle of law upon the question of due and ordinary care applies as in negligence cases, and upon conflicting evidence the issues are for the jury to determine.

**4. Same—Jurisdiction—Federal Courts—Maritime Law.**

An action involving the recovery of damages for the negligent killing of plaintiff's intestate while employed in rafting logs on a navigable river, by the tort of the defendant in towing rafts or barges thereon, may be brought by the administrator in the State courts, according to the principles existing at common law, which afford a complete remedy under the issues of negligence, contributory negligence, damages, etc., and the jurisdiction is not confined to the courts of Federal jurisdiction under the maritime law. Section 20 of the Seaman Act of 1915, ch. 153, not considered in deciding this appeal.

APPEAL by defendant from *Barnhill, J.,* and a jury, at April Term, 1927, of BLADEN. No error.

This was an action for actionable negligence brought by plaintiff, the administrator of Hardy Cromartie, deceased, against the defendant to recover damages.

The defendant, in its answer set up the defense that the action is within the exclusive admiralty and maritime jurisdiction of the United States District Court for the Eastern District of North Carolina, and plaintiff's intestate was guilty of contributory negligence.

The issues submitted to the jury and their answers thereto were as follows:

"1. Was plaintiff's intestate's death caused by the negligence of the defendant, as alleged in the complaint? Answer: Yes.

"2. If so, was such death due to the contributory negligence of plaintiff's intestate? Answer: No.

"3. What damage, if any, is plaintiff entitled to recover? Answer: $2,646.00."

The necessary facts and assignments of error will be considered in the opinion.

*H. H. Clark, Terry A. Lyon and J. Bayard Clark for plaintiff.*
*Bryan & Campbell and Ruark & Fletcher for defendant.*

CLARKSON, J. The first main question by defendant for decision: Was defendant entitled to have his motion for judgment as in case of nonsuit allowed at the close of plaintiff's evidence and at the close of all the evidence? C. S., 567. We think not. We repeat: "It is the settled rule of practice and the accepted position in this jurisdiction that, on a motion to nonsuit, the evidence which makes for the plaintiff's claim and which tends to support her cause of action, whether offered by the plaintiff or elicited from the defendant's witnesses, will be taken and considered in its most favorable light for the plaintiff, and she is entitled to the benefit of every reasonable intendment upon the evidence,

and every reasonable inference to be drawn therefrom." *Gore v. Wilmington, ante,* at p. 452, and cases cited.

The evidence, undisputed, tended to show: That at King's Bluff, on the Cape Fear River, the United States Government had built a lock or dam and provided a passageway for vessels, rafts, or floating crafts. This lock through which traffic passes is located on the west bank of the river, the right-hand side going down stream. It consists of the two heavy cement walls extending up and down stream several hundred feet. At each end there is a heavy steel gate. From the outer wall of the lock to the east bank of the river extends a dam about eight feet high, over which the river flows. Extending up-stream from the outside wall of the upper gate there is a row of piling, driven in clusters, and bearing slightly out towards midstream, each cluster separate from the other by about fifty feet, extending up-stream a total distance of about one hundred and fifty feet, the last being about ten feet further out from the shore than the first. The purpose of these is to prevent rafts or boats from swinging out into the strong water that goes over the dam while they may be waiting for the lock gate to open. Above the lock about one-half a mile there is a gradual bend in the river, with the point upon the west or right-hand side going down-stream. From this point down to the lock gates close along the west bank the water is quiet as compared to that in the midstream. An old raftsman refers to this strip of water near the west bank as the "dead water," and that further out as the "strong water." In other words, the west bank is still water and further out is the swift waters. The master of defendant's boat had the boat with two barges or lighters, about 27 February, 1926, moored or anchored above the locks at King's Bluff, loading cross-ties, about 700 to 775 feet from the lock. The bow of the lighter in-shore up against the bank and tied to an ash tree. The outside lighter was made fast right up to the other lighter and the boat dropped back and her bow in between the stern of the lighters—the bow being like a wedge between the lighters.

The river bends or curves at this point and from this point the locks could not be seen, when a boat or raft gets to this "point" or "curve," the current will drive it off to the left side of the river in the direction of the current—swift water. The master of the boat with the lighters moored, or anchored, was there about 3 o'clock in the evening before the catastrophe that night to load cross-ties. Night came on and the boat and lighters stayed there. The off-shore lighter was not loaded at this point. The lighters, or barges, were about 22 feet in width and the boat 11 feet wide. The front end of the lighters were tied together and they were 75 feet long. The boat was about 50 feet in length, and the boat's bow about 10 feet between the lighters and about 40 feet of the

boat extended down stream below the lighters. The lighters being fastened together at the front end and the bow of the boat between them at the down-stream end, made one of the lighters extend out towards the river current, making the obstruction about 44 feet wide at the point or curve, and in the path of the *still waters*. There was a light on the boat. The off-shore lighter was unloaded and could have been easily dropped down, which would have left some 22 feet and the water comparatively still. So far the parties are in practical agreement.

Plaintiff's evidence tended to show that his intestate, Hardy Cromartie, who had been rafting logs a number of years, with Mingo Atkinson, an experienced raftsman, on the Cape Fear River for thirty years, started down the river with a raft. The raft started from Woodel Ferry, about 12 o'clock noon, Friday; it had eleven clamps of logs 16 feet long; the raft was put together good and tight and 30 feet wide. When they left there was ordinary water in the river and a head of the rise. They reached the locks about 3 o'clock at night. Fire was on the front end of the raft, a bright fire light. A boat was along large enough to carry four men, tied to the side of the raft. Rafts were carried down the river by Atkinson in the night time and day time ever since the locks were built, and the purpose was to do the same that night. Atkinson testified: "I didn't know that the lighter was on the side of the boat until I got to about the middle of the raft, and I was heading right into the lighter with the raft, and pulling the raft out, it threw the front of it in the strong water. Hardy Cromartie was on the back end of the raft and I was on the front end. After passing the lighter he tried to make fast to the first set of piles, and missed that and we got in the boat to go ashore. When we got in the boat we were on the eve of going over the dam—the boat went down and Hardy Cromartie started to swim down the stream the way the raft was going. I held to the boat and hollered for help, and some parties from the locks came out to me with a boat and carried me ashore. I went over the locks holding to the boat. Just as Hardy stepped into the boat it went down, and it was on the eve of going over the dam, and then he swam towards the raft. The raft was going down stream. . . . I could not bring the raft back in towards the hill after passing the lighter. It would have gone over broadside—the curving raft would have caught the tide. . . . I was about the length of the raft when I discovered that there was a lighter tied to the side of the boat, and I was heading right into the lighter, and when I pulled out it put the front end of the raft going towards the dam, and I could not make it curve back. It was too short to come back in behind the lighter and make fast to the wharf. I was in slack water when I discovered the lighter. . . .

"Q. If the lighter had not been alongside of the boat on the outside of the tug-boat, could you have passed down to the lock gate without going far enough into the swift water to have pulled you over the dam? A. Yes, sir. If the lighter had not been beside of the boat I would have kept in the dead water and went right along. I could have picked up there, but the lighter was out so far that it threw us right out in the strong water. . . . I saw lights on the boat, but I *didn't see any on the lighter*. There was no one up moving around on the boat. I hollered when we got there, but I didn't see any one, and no one answered. . . .

"Q. What became of Hardy Cromartie? A. He was drowned. I didn't see him after he tried to catch hold of the raft. His body was later found. . . .

"Q. When rafting down the river, how was it customary to carry the raft, with respect to the river—what side—what part of the river? A. Going to the locks.

"(Court) Q. Yes? A. To the right.

"Q. From the point to the locks? A. On the right. Keep to the right. As soon as we get to that point we hold a raft right to the point and keep along in the dead water until we get near the locks, and when we get near the locks we can take up, and if the lock-keeper is not there we go to his home and get him to turn us through. . . . The dead water extends from the hill out into the river 40 feet to 50 feet. If the water is high you have to begin holding a raft as soon as you get away from Daniels' Landing. It is hard to come in to shore, but if you get in on that point, close in, you can then drift down to the locks. You can set out pretty well on low water, but on high water, as soon as you come around Daniels' Landing you have to pull right in and keep close in. If you don't keep close in, you go over the dam. . . . Well, when I discovered the lighter was side of the boat, I couldn't see the boat—I mean the lighter—until I got about the length of the raft, and after I discovered it I was near the lighter and pulled the front out, and that threw the front end into the *live water*. . . . When the raft gets into the swift water going down stream below Daniels' Landing it goes over the dam. You can't save one and put it through the locks if it gets into the swift water from Daniels' Landing on down. It will go over the dam. When the raft passed the lighter it was partly in swift water and partly in slack water, and when it passed the lighter it was heading straight for the dam. When we passed the lighter I had no idea but that it was going over then. I believed it was going over then, but we tried to make fast to the first piling, and missed that, and I took the boat and paddled back, and as soon as Hardy stepped in it sunk down."

The combined width of the lighters and the boat was greater than the strip of dead water along the west bank, which was practically the only navigable part of the river at this point. *About nine o'clock on the night in question,* a raft came down to the lock, in charge of Grant McKoy and a helper. It came upon the boat and lighters anchored in the dead water. It could not get around this obstruction and back into the lock gate without going into the strong water. Such was attempted by the raft, but it went over the dam.

Several raftsmen of long years' experience, testified, in substance: If a raft comes around the up-stream so far out in the stream as to be unable to pull into the strip of dead water lying immediately along the western shore, it can never reach the lock gate, and always goes over the dam. This strip of dead water is the only navigable part of the stream at this point. All traffic must pass through the lock. In order to do so this strip of dead water, and it only, must be used. This is true in a peculiar way of a timber raft, which can move along only as the current moves it.

Defendant's evidence tended to show: The boat had a light on it, also there were *lights on the barges, or lighters.* The master of the boat testified: There was about a twelve foot rise in the river. *This raft was coming right down the middle of the river.* "I stayed up until the raft went over the dam. The men were hollering when they passed me. They never came within forty feet of the lighter or the boat. They were off in the river. My boat and lighters were lying in a pocket above the locks—I am speaking about the raft which Henry Cromartie was on, and I say it was ten minutes to four when I first was aroused from sleep and heard them hollering. They went over the dam ten or fifteen minutes later. It was the hollering that roused me from sleep and caused me to come out and look up the river, and the raft was out in the current on the east side of the river when I first saw it, and it was about a quarter of a mile up the river from my boat when I saw it, and passed not nearer than forty feet from my off-shore lighter. This raft did not get near enough to me to render any aid."

The principle is well stated in 27 R. C. L., sec. 227, p. 1320, as follows: "The right to use watercourses as highways, and the right to use highways on land, are said to be analogous, and to depend on the same general principles. One's right to navigate a public river is not a private but a public right, to which he is entitled only in common with the whole public. Any and all of the public have an equal right to a reasonable use, but the enjoyment by one necessarily interferes to some extent, for the time being, with its absolutely free and unimpeded use by others, and each must exercise his rights with a proper regard for the rights of others. Navigable waters constitute a public highway, open and free for the passage of all classes and sizes of water craft

which have a right to follow the usual channels. And a traveler for pleasure is as fully entitled to protection in using a public way, whether by land or by water, as a traveler for business. This common right exists not only between boats, but also between boats and logs floating down a stream." See *Hardison v. Handle Co.; ante,* 351.

The river is a public highway, all having equal rights to navigation. Where defendant anchored the boat and lighters, or barges, from the plaintiff's testimony, which was accepted by the jury, it was in the wake of the only safe passage for rafts. Defendant knew, or ought to have known in the exercise of due or ordinary care, that rafts were customarily traveling the river highway at night as well as day going through the lock. The master of defendant's boat had been plying or traveling the Cape Fear River for thirty odd years. That the mooring or anchorage of the boat and lighters without a light on the offshore lighter, or barge, the raft would in turning the point or curve to get into still water, either collide with the lighter or be thrown out into the swift current and go over the dam. The defendant had a right to anchor on the river highway, but the peculiar place, near the point or curve in the river, where the raft had to turn into still water to keep from the swift current. The manner—the two lighters tied together at the top, and the bow of the boat between them at the end, throwing the rear of the off-lighter further into the river, perhaps fifty feet, taking up practically all the still water, the raft traffic passageway, no light on the off-lighter. It was a question of due and ordinary care and a fact for the jury, and the motion for nonsuit properly overruled. The court below gave the contentions of the parties clearly and fairly, explained the law applicable to the facts and charged the well-settled law as to negligence, proximate cause and contributory negligence.

The second main question presented by defendant for decision: Was it the duty of the court to apply the law as it exists in Admiralty, or as to common law in the courts of the State, when the tort complained of, if any, was committed upon the navigable waters of Cape Fear River?

We think the action was tried correctly, under the principles of the common law and the issues of negligence, contributory negligence and damages the proper ones. We adduce from the decision of the United States Supreme Court, construing the statutes, civil causes of maritime and admiralty jurisdiction actions in tort, *in personam* and not *in rem,* under the facts as shown in this case, as follows: "State courts can exercise jurisdiction and give a remedy for a consequential injury growing out of a marine tort, where no remedy for such an injury exists in the admiralty courts. A suitor may have a remedy in a case in a State court, even if the admiralty courts have jurisdiction, where the right of action was created by a State statute enacted subsequent to the passage of the judiciary act. Suitors may have a common-law remedy in all

cases where the common law is competent to give it. These principles applied to a suit in a State court by an administrator, to recover damages, under a State statute, for an act causing the death of his intestate, done by a steamer in navigable waters." Syllabus in *American Steamboat Co. v. Chace,* 83 U. S. Sup. Ct. Reports, p. 522, 21 Law Ed., p. 369. See notes, p. 1030. The *Chace case* is approved in *Panama Railroad Co. v. Vasquez, Admr.,* 271 U. S., p. 557. In the latter case it is said, at p. 559 : "The sole question presented is whether State courts may entertain such actions, the defendant's contention being that they are cognizable only in the Federal District Court. . . . (p. 560.) The sections of the Judicial Code just cited, while investing the Federal District Courts with jurisdiction 'exclusive of the courts of the several states' of all 'civil causes of admiralty and maritime jurisdiction,' contain an excepting clause expressly 'saving to suitors in all cases the right to a common-law remedy where the common law is competent to give it.' The clause is a continuation of a like clause in the Judiciary Act of 1789 and always has been construed as permitting substantial rights under the maritime law to recover money for service rendered, or as damages for tortious injuries, to be asserted and enforced in actions *in personam* according to the course of the common law. *Chelentis v. Luckenbach Steamship Co.,* 247 U. S., 384; *Panama R. R. Co. v. Johnson, supra* (264 U. S., 375), p. 388, 390. And it uniformly has been regarded as permitting such actions to be brought in either the Federal courts or the State courts as the possessor of the right may elect. (Citing numerous authorities) . . . (p. 561). In so saying, we must be understood as fully recognizing what often has been held in other cases—that the saving clause does not include suits *in rem* or other forms of proceeding unknown to the common law. (Citing numerous authorities) . . . (p. 562). And that the more reasonable view is that it is intended to regulate venue and not to deal with jurisdiction as between Federal and State courts." See case on "all fours" as to present action, citing *Vasquez case, supra; Messel v. Foundation Co.,* 47 Supreme Court Rep., p. 695 (decided 31 May, 1927).

Our own Court, in *Smith v. R. R.,* 145 N. C., at p. 101, lays down the same principle as follows : "The action being prosecuted in the State courts for alleged negligence, the rules obtaining in courts of admiralty in such cases do not apply. The rights and liabilities of the parties are to be ascertained by resorting to the principles which control in actions for alleged negligence wherein contributory negligence is set up as a defense."

In passing on this matter it may not be amiss to say that we are not now considering section 20 of the Seaman Act of 1915, ch. 153, 38 Stat., 1164, as amended by section 33 of the Merchant Marine Act of

1920, ch. 250, 41 Stat., 988, under which the Vasquez action, *supra,* arose. Where a *seaman* suffered personal injuries *in the course of his employment,* and the Seaman Act, *supra,* gave the same rights as railway employees under the Federal Employers Liability Act. The Seaman Act was applied to common-law action brought in State courts, and "stevedores" were included in the act. See *International Stevedoring Co. v. Harverty,* U. S. Sup. Ct. (1926), 71 Law Ed., 22. In actions of that kind, although tried in the State court, the fellow-servant doctrine is abolished and contributory negligence shall not bar recovery, but shall only diminish the damages, except that no employee injured or killed where the violation of a safety law for employees contributed to the injury, shall be held to have been guilty of contributory negligence. See *Inge v. R. R.,* 192 N. C., at p. 536 (petition for writ of *certiorari* denied by Sup. Ct. of U. S., 28 February, 1927); *Troxler v. R. R., ante,* 446.

In *Robins Dry Dock and Repair Co. v. Lars Dahl,* 266 U. S., p. 449, 69 Law Ed., p. 372, it is held (syllabus): "The right and liabilities of the parties to an action by one doing repair work on a vessel lying in navigable waters of the United States, to recover damages for injuries caused by the breaking of a scaffold, arise out of and depend upon the general maritime law, and cannot be enlarged or impaired by the statute of the State where the injury occurred. It is error in an action in a State court to recover damages for injuries to an employee engaged in repairing a vessel lying in navigable waters of the United States, due to the breaking of a scaffold, to permit the jury, in determining the question of negligence, to consider a *State statute fixing the duty of the master with respect to scaffolds."* (Italics ours.) The assignments of error are untenable.

The action was tried with care, and after examining with pains the record and the able briefs of counsel, we can find, in law,

No error.